UNITED STATES

v.

**Airman First Class Mark S. TYHURST,
FR 550–73–5666, United States
Air Force.**

ACM 26944.

U.S. Air Force Court of Military Review.

Sentence Adjudged 25 April 1988.

Decided 17 March 1989.

Appellate Counsel for the Appellant: Colonel Richard F. O'Hair and Captain William E. Boyle.

Appellate Counsel for the United States: Colonel Joe R. Lamport, Lieutenant Colonel Robert E. Giovagnoni and Major Kathryn I. Taylor.

Before LEWIS, BLOMMERS and KASTL, Appellate Military Judges.

## DECISION

KASTL, Senior Judge:

Are analog or so-called designer drugs punishable under the current language of Article 112a, UCMJ, 10 U.S.C. § 912a? Frequently they are not, we hold today.

Airman First Class (A1C) Tyhurst was found guilty in accordance with his pleas of various drug-related offenses involving cocaine, methamphetamine, marijuana, and lysergic acid diethylamide. In addition, he offered a conditional guilty plea as to use and distribution of N–hydroxy–3, 4–methylenedioxy amphetamine. The substance was characterized at trial—wrongly, we are advised—by the street name of "Ecstasy."[1] In this opinion, we will refer to the

substance as N-hydroxy MDA. According to stipulated expert testimony at trial, the substance is a chemical analog of the drug 3–4 methylenedioxy amphetamine. The parent drug has been a controlled substance under Federal law since 1970. As to N-hydroxy MDA, the accused's plea was conditioned upon his argument that its use and distribution did not violate Article 112a of the Code.

As the defense explained it at trial, N-hydroxy MDA was not categorized under military law as an illegal substance until after the accused ceased his involvement with it, around 30 September 1987. More specifically, the defense argues that N-hydroxy MDA was only listed as a controlled substance on 15 October 1987; on that date, the Drug Enforcement Administration designated it as a controlled substance in the Federal Register, placing it on a schedule which Article 112a incorporates. *See* 21 C.F.R. Part 1308, 15 October 1987, p. 38225 and Sec. 1308.11(g); *see also* MCM 1984, Part IV, paragraph 37c.

At trial, the military judge overruled the defense motion to dismiss the two offenses related to N-hydroxy MDA, wrongful use and distribution. The accused was then found guilty of all offenses charged and sentenced by the military judge sitting alone as a general court-martial to a bad conduct discharge, three years of confinement, total forfeitures, and reduction to the lowest enlisted grade.

Before us, A1C Tyhurst renews his contention that neither his use nor distribution of N-hydroxy MDA is an offense under Article 112a. Because of the significance of the question, we joined this case to another with a similar issue which was pending review, *United States v. Loftin*, 28 M.J. 677 (A.F.C.M.R.1989), and ordered oral argument.

### Historical Background

So-called "designer drugs" are synthetic substitutes for existing drugs. The

---

1. The true "Ecstasy" is another designer drug analogous to its parent, 3, 4–methylenedioxy amphetamine, we are informed. *See United States v. Loftin*, 28 M.J. 677 (A.F.C.M.R.1989),

treated as a companion case for purposes of oral argument; there, the substance charged was "Ecstasy."

designer drug concept has been called "diabolically simple:"

> [T]he underground chemist makes a simple molecular alteration to an existing drug. The original is a controlled substance, but because illegal drugs are defined and classified in the United States by their precise molecular structure, the new chemical cousin, or analog ... is, in effect, as legal as powdered milk.[2]

Moreover, as soon as one new version is discovered and controlled by the authorities, the chemist can go "back to the lab, make another small change, and stay one step ahead of the law."[3]

One synthetic heroin copycat, a fentanyl analog, has the street name of China White; over 100 people reportedly have died from overdoses. Another synthetic heroin, made from the narcotic meperidine (commonly known by the trade name Demerol), has caused dozens of users to experience disfiguring and irreversible symptoms of advanced Parkinson's disease.[4]

■ To combat these shocking chemical compounds, Congress recently expanded existing Federal drug legislation by passing the Controlled Substance Analogue Enforcement Act of 1986, 21 U.S.C. § 813, and by establishing new, wide-ranging definitions of drug analogs. The Analogue Act attacks the problem by prohibiting all permutations of existing illegal drugs, including analogs, whether known or unknown.[5] The Act also proscribes the manufacture and possession of any clone producing an effect "substantially similar to or greater than an already-banned controlled substance." Therefore, if the designer analog

has a *structure* substantially similar to an illegal drug, the analog automatically becomes illegal, even if newly-invented. Likewise, if the copycat drug is intended to produce an effect substantially similar to the "high" produced by an illegal drug, it is outlawed as well.[6] *See* 21 U.S.C. § 802(32)(A).

Reports on the Controlled Substance Analogue Enforcement Act of 1986 in both the House and Senate strongly emphasized that its intent was to discourage clandestine "basement chemists," who skirted existing laws by molecular tinkering; the reports viewed with dismay numerous deaths from analog drugs reputed to be 3,000 times more potent than heroin.[7]

Despite the ostensible need to prohibit designer drugs, prosecutions have moved slowly. There are no reported cases following enactment of the 1986 law except for a short *per curiam* opinion in *United States v. Desurra*, 865 F.2d 651 (5th Cir. 1989). According to counsel during oral argument before us, the Drug Enforcement Agency has several cases underway in the Federal courts, but nothing addressing the issue in depth has been published at the appellate level.

### Designer Drugs and Article 112a

■ We hold that A1C Tyhurst may not be punished under Article 112a for using N-hydroxy MDA prior to 15 October 1987, the date on which the substance was banned in the Federal Register.

Article 112a prohibits various acts involving "controlled substances." Such "controlled substances" fall into the following

---

2. Burden & Burden, *Et. Al.,* Student Lawyer, May 1986, p. 42.

3. *Ibid.*

4. *Ibid.* Newspaper stories relate that in California, $16,000,000 worth of street value heroin analog was seized in 1988; the substance was said to be 36 times more powerful than heroin. *See* New York Times, 4 August 1988, p. 27. Over 186 illegal laboratories have been closed down in San Diego county alone. *See* New York Times, 31 August 1988, p. 1. In another case closer to military circles, one individual was indicted for creating a heroin substitute in the facilities of the Naval Research Laboratory

in Washington, DC; the copycat substance was said to be worth some $4,000,000 on the street. *See* Washington Post, Metro Section C1, 28 November 1986. *See generally* Note, *Synthetic Drug Legislation: Broadening the Classifications by Defining "Controlled Substance Analog" as a Percentage of Common Structural Elements,* 64 U.Det.L.Rev. 775 (Summer 1987).

5. Burden & Burden, *supra,* at 43.

6. *Ibid.*

7. *See* Sen.Rpt. 99–296, 21 November 1985 and House Rpt. 99–848, 19 September 1986.

three categories: (a) opium, heroin, cocaine, amphetamine, and the like, to include any compound or derivative of such substances; (b) items not specified in subsection (a) above but listed upon a schedule of controlled substances prescribed by the President; and (c) substances not included under (a) or (b) but contained in Schedules I through V, which appear within the basic Federal anti-drug legislation at 21 U.S.C. § 812. *See* MCM, 1984, Part IV, paragraph 37(a)(b). As can be readily observed, a given substance may violate Article 112a in one of three ways. We find that N-hydroxy MDA fit under none of these three prior to 15 October 1987.[8]

We cannot rationally shoehorn A1C Tyhurst's conduct into the category of drug use or distribution which is criminalized under Article 112a. To counter substance abuse, military law employs a useful legal mechanism under Article 112a—the Federal drug schedules at 21 U.S.C. § 812 are assimilated into military law. These Federal drug schedules can be expanded when unsafe new substances enter the marketplace. In the present case, we agree with the defense that N-hydroxy MDA was neither properly banned by one of the schedules nor otherwise outlawed under Article 112a at the time of the accused's use and distribution.

The Government seeks to convince us that the accused's use and distribution of N-hydroxy MDA nevertheless is punishable under the UCMJ through an application of the Controlled Substance Analogue Enforcement Act, 21 U.S.C. § 813. That statute states:

A controlled substance analog shall, to the extent intended for human consumption, be treated, for the purposes of this title and Title III [portions of Title 21] as a controlled substance in Schedule I.

In support of its position, the Government reminds us that 21 U.S.C. § 802(32)(A) was revised at the time the Analogue Act was passed, to include a crucial definition of the words "controlled substance analogue." This term refers to a substance which:

—has a chemical structure substantially similar to that of a controlled substance in Federal anti-drug Schedules I or II; or

—has a stimulant, depressant, or hallucinogenic effect on the central nervous system substantially similar to that of a controlled substance under those two schedules; or

—with respect to a particular person, is a substance which the person represents or intends to have a stimulant, depressant, or hallucinogenic effect.

Considering these legislative changes at both 21 U.S.C. § 802(32)(A) and 21 U.S.C. § 813, the Government argues that the copycat offspring of an illegal drug may be prosecuted under Article 112a of the UCMJ to the same extent as its parent. In effect, the Government's syllogism is this: (a) Article 112a(b)(1) bans controlled substances listed under schedules implemented by 21 U.S.C. § 812; (b) Section 813 mirrors Section 812 and says designer drugs "shall ... be treated" as controlled substances; and (c) therefore, Article 112a of the UCMJ now covers both 21 U.S.C. §§ 812 and 813.

■ We do not agree. The fact that a given substance violates 21 U.S.C. § 813 *fails to establish a violation for purposes of prosecution under Article 112a.*

■ We find nothing in legislative history or intent to support the Government's proposition that analog drugs are covered by Article 112a. The Controlled Substance Analogue Enforcement Act, 21 U.S.C. § 813, was enacted in 1986, two years after the 1984 Manual for Courts–Martial. No subsequent action incorporated Section 813 within Article 112a. Moreover, the language of 21 U.S.C. § 813 appears self-limiting: it requires the analog to be treated as a Schedule I controlled substance for pur-

---

8. Prior to the 1986 Analogue Substance Act, elevating a given new substance into the proscribed category of drugs was a two-step process. First, it had to be specifically listed within the definition of "narcotic drug" to be controlled; it did not suffice that the substance simply was a narcotic or a hallucinogen to come under the statute's proscriptions. Second, the drug must be formally entered into the classification through established lawmaking procedures. *See* Note, *Synthetic Drugs Legislation, supra,* at 782.

poses of "this title and Title III." "This title" and "Title III" refer to overall Federal drug supervision within 21 U.S.C. There appears to be no other specific legislative history to reveal how 21 U.S.C. § 813 was to interact with other sections of 21 U.S.C. or the UCMJ. We believe it strains logic to impute such a legislative intention when nothing suggests that 21 U.S.C. § 813 was to be assimilated by the armèd forces. Without some evidence, we refuse to read Article 112a as some type of military law PACMAN, designed to absorb every new drug law passed by Congress or ban every new drug mischief.

■ It is obvious that Article 112a makes no reference to analogs. Less obvious, perhaps, is the fact that the Government has failed to carry its burden of proof that N-hydroxy MDA is either a "derivative" or a "compound" as defined in Article 112a. We are hampered by the fact that the record of trial did not develop workable definitions of these words and by the further fact that we have little expertise in chemistry. As best we can understand it, a "derivative" traditionally is the same basic drug appearing in a different form yet having the same molecular structure as its parent drug. *See* Steadman's Medical Dictionary 336 (22d Ed.1972). A "compound" is a preparation containing several ingredients. *Id.* at 276. Even the broadest definition of "derivative" drug—in a civil rather than a criminal case—requires that the copycat *be prepared from that parent drug. See Reckitt & Colman, Ltd. v. Drug Enforcement Administration*, 788 F.2d 22, 24 (D.C.Cir.1986). As we understand it, N-hydroxy MDA is not prepared from its parent drug. Therefore, we cannot agree with our concurring brother that the offense might currently be punishable under Article 112a. Furthermore, if analogs are already covered as "derivatives" of outlawed drugs, there would have been no need to revisit a half century of classifying drugs by their precise molecular structure and take a new approach in the Analog Act in 1986.

### Future Cases

We are aware that dangerous drug-related conduct escapes retribution today. The remedy lies in legislative or executive action. It is also possible that Air Force Regulation 30–2, *Social Actions Program*, might be revised to address the issue.

On the present facts, we discern no lesser included offense present. *See generally United States v. McKinley*, 27 M.J. 78, 79–80 (C.M.A.1988). We reserve for a future day the possibility that a court-martial could be successful under Article 134, 10 U.S.C. § 934, perhaps under its crimes and offenses not capital clause, directly using 21 U.S.C. § 813. *See generally United States v. Desurra*, 865 F.2d 651 (5th Cir. 1989); *United States v. Reyes–Ruiz*, 16 M.J. 784 (A.C.M.R.1983) (use of ephedrine) and *United States v. Frostell*, 13 M.J. 680 (N.M.C.M.R.1982) (use of a powdered stimulant in Japan). *See also United States v. Stocken*, 17 M.J. 826, 828–829 (A.C.M.R. 1984). This case was not tried under Article 134.

### Reassessment

■ The Additional Charge and its two specifications involving N-hydroxy DMA are dismissed. We reassess the sentence. A1C Tyhurst's record is punctuated with the use of numerous illegal substances on many occasions. Upon reassessment, we find the sentence nonetheless appropriate. *See generally United States v. Sales*, 22 M.J. 305 (C.M.A.1986).

The findings of guilty, as modified, and the sentence are correct in law and fact and, on the basis of the entire record are

AFFIRMED.

Senior Judge LEWIS concurs.

Judge BLOMMERS (concurring in the result):

I am not at this time ready to accept my brothers' conclusion that wrongful involvement with an analog drug cannot presently be prosecuted under Article 112a of the Uniform Code unless the analog itself is listed on one of the schedules of Section 202 of the Controlled Substances Act (21 U.S.C. § 812). Our views differ as to the

definition or scope of the term "derivative."

Prohibited substances include "opium, heroin, amphetamine, lysergic acid diethylamide, methamphetamine, phencyclidine, barbituric acid, and marijuana and any compound *or derivative* of any such substance." Article 112a(b)(1), UCMJ (emphasis added). Neither the Controlled Substances Act (where the term is also used), the Uniform Code, nor their legislative histories define this term. In my view, the definition Senior Judge Kastl would apply is perhaps too restrictive. The very case he cites, *Reckitt & Colman, Ltd. v. Administrator, Drug Enforcement Administration*, 788 F.2d 22 (D.C.Cir.1986), lends support to a broader definition. In that case, plaintiff chemical company sought to overturn the Administrator's decision classifying buprenorphine as a narcotic under the Controlled Substances Act. It was contended that the classification rested on an improper determination that buprenorphine was a "derivative" of the opiate drug thebaine. The company argued that the Administrator applied an overly broad definition to the term "derivative." The dispute centered around the extent of the chemical procedures necessary to make buprenorphine from thebaine (apparently a six or seven step process). The chemical company contended that one substance could be considered a derivative of another only if it can be produced in one or two chemical operations. The Administrator rejected this narrow "two-step" definition. He ruled that the agency would regard as a derivative of a drug "any substance (1) prepared from that drug, (2) which chemically resembles that drug, and (3) which has some of the adverse effects of that drug." 788 F.2d at 24–25. He concluded "that '[t]o attribute great significance to the actual number of chemical steps is misleading'—that what is important, rather, is the overall chemical similarity of the product to its parent." *Id.* at 25. To support his reasoning, the Administrator relied upon the definition of "derivative" set forth in *Van Nostrand's Scientific Encyclopedia* (5th ed. 1976):

A term used in organic chemistry to express the relation between certain known or hypothetical substances and the compound formed from them by simple chemical processes in which the nucleus or skeleton of the parent substance exists.

*Id.* All of the experts who testified at the administrative hearing agreed that "thebaine's 'skeleton' is contained within that of buprenorphine but that an additional side chain of atoms is attached to this skeleton in buprenorphine." *Id.* at 26. The Circuit Court upheld the Administrator's decision, finding that his interpretation of the term "derivative" was reasonable and consistent with the purpose of the Controlled Substances Act.

I find one other point made by the Circuit Court in *Reckitt & Colman, Ltd.* to be of interest. The chemical company argued that since they were dealing with an undefined and potentially ambiguous statutory term, Congress must have intended that "derivative" be given a very narrow and precise definition. The Circuit Court stated:

This argument is misconceived. Congress has expressly restricted criminal liability to knowing or intentional violations of the Act, *see, e.g.*, 21 U.S.C. Sec. 841 (1982), and so has obviated any potential due process problems implicated by a vague definition of statutory terms such as "derivative."

*Id.* at 25, n. 3. To be punishable under article 112a, UCMJ, an accused must have knowledge of the contraband nature of the substance involved. MCM, Part IV, para. 37c(5) (1984). *See United States v. Mance*, 26 M.J. 244 (C.M.A.1987); *United States v. King*, 17 M.J. 1099 (A.F.C.M.R.1984).

As I read the record, we presently face a situation very similar to that faced by the Circuit Court in *Reckitt & Colman, Ltd.* A stipulation of expected testimony of Mr. Frank L. Sapoenza, a pharmacologist with the Drug Enforcement Administration, was presented to the court. In it he states that 3, 4 methylenedioxy amphetamine (MDA) has been a Schedule I controlled substance since passage of the Controlled Substances

Act in 1970. "N–hydroxy–MDA is related to MDA, and is a chemical analog of MDA. These substances are related structurally in the same way methamphetamine and amphetamine are structurally related." In *United States v. Loftin*, 28 M.J. 677 (A.F. C.M.R. 17 March 1989), which was combined with *Tyhurst* for oral argument, an even more detailed stipulation of the expected testimony of Mr. Sapienza is in the record. It contains actual drawings of the chemical structures of the drugs involved (the precise chemical nature of the analogs present in these two cases are slightly different, though both are commonly referred to by the same street name "Ecstasy"). It is abundantly clear that the chemical "skeleton" of the parent drug is present in the analog.

Suffice it to say, at this point I am not ready to conclude that analogs similar to those with which we are dealing in the cases now before us cannot be prosecuted under Article 112a as "derivatives" of their parent drugs. However, in neither *Tyhurst* or *Loftin* did the Government raise this theory as a basis to support prosecution of the charged offenses relating to the drug "Ecstasy." Thus, there has been no record developed upon which this Court could intelligently address the issue. I therefore concur in the result reached.