UNITED STATES, Appellee,

v.

Brian F. REICHENBACH, Airman, U.S.
Air Force, Appellant.

No. 61504/AF.
ACM 26857.

U.S. Court of Military Appeals.

Sept. 25, 1989.

For appellant: *Captain William E. Boyle* (argued); *Colonel Richard F. O'Hair* (on brief).

For appellee: *Major Kathryn I. Taylor* (argued); *Colonel Joe R. Lamport* and *Lieutenant Colonel Robert E. Giovagnoni* (on brief).

*Opinion of the Court*

EVERETT, Chief Judge:

A military judge sitting alone as a general court-martial at Bergstrom Air Force Base, Texas, tried appellant on two charges alleging drug offenses, in violation of Article 112a, Uniform Code of Military Justice, 10 USC § 912a. Reichenbach pleaded guilty to the original Charge, which alleged wrongful use of marijuana, cocaine, and lysergic acid diethylamide (LSD), and wrongful distribution of cocaine. The second Charge—pleaded as an Additional Charge—alleged in specification 1 that "on divers occasions, between on or about 1 February 1987 and 19 September 1987," appellant wrongfully used "a controlled substance analogue, known as ECSTASY,

treated as a Schedule I controlled substance under Title 21, United States Code, section 813, to wit: an analogue of 3, 4 methylenedioxy amphetamine." Specification 2, in similar language, alleged wrongful distribution of ECSTASY "between on or about 1 February 1987 and 23 September 1987." A third specification alleged wrongful distribution of LSD.

After moving unsuccessfully to dismiss the first two specifications of the Additional Charge on the ground that they did not plead an offense, Reichenbach entered conditional pleas of guilty. Thereupon, the convening authority withdrew the LSD specification and deleted from the second specification an allegation that the distributions occurred on "divers occasions." The military judge entered findings pursuant to the pleas of guilty and sentenced Reichenbach to a bad-conduct discharge, confinement for 17 months, total forfeitures, and reduction to the grade of airman basic. The convening authority approved the sentence; and the Court of Military Review affirmed in a short-form opinion. We granted review to determine whether appellant's use and distribution of ECSTASY were offenses under Article 112a.[1]

## I

### A

We have discussed the status of drug offenses in the military as follows:

The Uniform Code [as of 1982] contain[ed] no express prohibition of drug abuse; ...

Prosecution of drug offenses has been handled in these three ways: (1) Under the first two clauses of Article 134, [UCMJ, 10 USC § 934,] proscribing "disorders and neglects to the prejudice of good order and discipline in the armed forces" or "conduct of a nature to bring discredit upon the armed forces"; (2) under the third clause of Article 134, which

---

1. The granted issue was:
WHETHER MDMA (3, 4 METHYLENEDIOXY METHAMPHETAMINE) WAS NOT PLACED INTO SCHEDULE I (21 USC § 812) BY 21 USC § 813 THEREBY FAILING TO MAKE APPELLANT'S USE AND DISTRIBUTION AN OFFENSE UNDER ARTICLE 112A, UCMJ.

prohibits "crimes and offenses not capital" and, in effect, incorporates other penal provisions of the United States Code; and (3) under Article 92, [UCMJ, 10 USC § 892,] as a violation of various service regulations concerning drug abuse.

*United States v. Ettleson*, 13 MJ 348, 358 (CMA 1982) (footnote and citation omitted).

To simplify and facilitate the prosecution of drug offenses,[2] Congress in 1983 added to the Code Article 112a, which provides:

(a) Any person subject to this chapter who wrongfully uses, possesses, manufactures, distributes, imports into the customs territory of the United States, exports from the United States, or introduces into an installation, vessel, vehicle, or aircraft used by or under the control of the armed forces a substance described in subsection (b) shall be punished as a court-martial may direct.

(b) The substances referred to in subsection (a) are the following:

(1) Opium, heroin, cocaine, amphetamine, lysergic acid diethylamide, methamphetamine, phencyclidine, barbituric acid, and marijuana and any compound or derivative of any such substance.

(2) Any substance not specified in clause (1) that is listed on a schedule of controlled substances prescribed by the President for the purposes of this article.

(3) Any other substance not specified in clause (1) or contained on a list prescribed by the President under clause (2) that is listed in schedules I through V of section 202 of the Controlled Substances Act (21 U.S.C. 812).

The Controlled Substances Act referred to in Article 112a(b)(3) was enacted by Congress in 1970 as the Comprehensive Drug Abuse Prevention and Control Act, Pub.L. No. 91–513, Title II § 101 et seq., 84 Stat. 1236, 1242 (1970).[3] Among other things, this Act authorized the Attorney General—after providing the "opportunity for a hearing pursuant to the rule-making procedures prescribed by" the Administrative Procedure Act, *see* 21 USC § 811(a)—to establish "five schedules of controlled substances, to be known as schedules I, II, III, IV and V," *see* 21 USC § 812.

Findings are required for each of the schedules. *See* 21 USC § 812(b). For example, to be placed in schedule I, there must be these findings:

2. As stated in the Senate Report on Article 112a:

Although drug abuse is one of the most serious disciplinary problems facing the armed forces, there is no specific section of the UCMJ concerning illegal drugs. Prosecution of drug offenses under Article 133 (conduct unbecoming an officer and a gentleman), Article 134 (e.g., crimes that are prejudicial to good order and discipline, service discrediting) or Article 92 (violations of lawful orders) are cumbersome, and have led to litigation about compliance with the technical requirements of those Articles and implementing provisions. *See, e.g., United States v. Ettleson*, 13 M.J. 348 (C.M.A.1982); *United States v. Thurman*, 7 M.J. 26 (C.M.A.1979); *United States v. Gui[l]bault*, 6 M.J. 20 (C.M.A.1978).

Although prosecutions under Articles 92, 133 and 134 are appropriate, Congress traditionally has set forth the details of significant offenses in the text of the UCMJ. There is a detailed statutory scheme for addressing drug offenses in the civilian sector under title 21, United States Code. In view of the substantial dangers to morale and readiness created by drug abuse in the armed forces, and the con-

tinuing litigation in this area, it is essential that Congress provides a specific article on controlled substances in the UCMJ.

The new Article follows the tradition of the UCMJ by setting forth the specific offenses. The maximum punishments will be established by the President in the Manual for Courts–Martial under Article 56. The article sets forth some of the more frequently abused substances, such as marijuana, cocaine, heroin, and LSD and incorporates the controlled substances listed by the Attorney General under title 21, as well as any controlled substances listed by the President in the Manual for Courts–Martial.

S.Rep. No. 53, 98th Cong., 1st Sess. 29 (1983); *see* H.R.Rep. No. 549, 98th Cong., 1st Sess. 17 (1983), *reprinted in* 1983 U.S. CODE CONG. & ADMIN. NEWS 2177, 2182.

3. At about the same time the National Conference of Commissioners on Uniform Laws promulgated a Uniform Controlled Substances Act, which followed generally the Federal legislation and was the model for state laws on controlled substances.

(A) The drug or other substance has a high potential for abuse.

(B) The drug or other substance has no currently accepted medical use in treatment in the United States.

(C) There is a lack of accepted safety for use of the drug or other substance under medical supervision.

For schedule II, the required findings are:

(A) The drug or other substance has a high potential for abuse.

(B) The drug or other substance has a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions.

(C) Abuse of the drug or other substances may lead to severe psychological or physical dependence.

Schedules III, IV, and V require findings that the drug or other substance has less potential for abuse than the drugs or other substances in schedules I and II; that it has "a currently accepted medical use in treatment in the United States"; and that it tends to lead to less physical and psychological dependence than is true of the drugs and substances in the lower-numbered schedules.

When Congress originally enacted the Controlled Substances Act, it listed a variety of substances under the five schedules. For example, the list under schedule I included heroin, marijuana, and lysergic acid diethylamide. In subsequent years, the Attorney General has added controlled substances to the schedules pursuant to the authority delegated under 21 USC § 811.

Unfortunately, because of the ingenuity of drug dealers and underground chemists, hazardous substances have been placed in circulation which were not listed on the five schedules; and a substantial quantity of a new drug might be distributed before the

Attorney General could comply with the procedures which 21 USC § 811(a) required for adding substances to the schedules. As Congress recognized:

Confined by Federal drug legislation that ties unlawful conduct to precise chemical definitions, law enforcement authorities have long found themselves at least one step behind drug dealers who possess certain rudimentary scientific abilities. Thus in the 1960's certain mescaline derivates created great problems until controlled under the Drug Abuse Control Amendments and their successor legislation, the Controlled Substances Act (CSA). In the 1970's, various analogs of PCP and methaqualone flourished until eventually brought within the exact definitions of the Act. Again in the 1980's the drug laws have been circumvented by profiteers capable of making minor alterations in the molecular structure of a controlled substance. Recent analogs have been based largely on the substances meperidine and fentanyl, from which models an almost infinite number of imitations can be derived. For example, the American Chemical Society notes:

Fentanyl is not a simple molecule, and it turns out that a vast number of relatively minor modifications of its molecular structure result in compounds that also act as potent narcotics—in some cases, many times as potent as fentanyl. Tinker with a side chain here, add a halogen there, and the result is still probably a chemical that packs a powerful wallop, a chemical that can be sold on the street as heroin, and a chemical that might very well be as legal as sugar.

S.Rep. No. 196, 99th Cong., 1st Sess. 1 (1985).[4]

As was also understood by Congress:

4. As Senator Chiles of Florida noted in testimony before the Subcommittee on Crime of the House Judiciary Committee, many designer drugs are more dangerous than the parent drugs. "Designer drugs such as the fentanyl analogues have resulted in over one hundred drug overdoses because in some cases they are as much as 3,000 times more.potent than heroin." H.R.Rep. No. 848, 99th Cong., 2d Sess. 4 (1986). According to the same witness, one designer drug, MPPP, had been marketed with processing impurities; and the resulting drug, MPTP, had left dozens of users totally paralyzed

The Federal Food, Drug, and Cosmetic Act [21 U.S.C. 301, et seq.] is also inadequate to combat the analog problem. 21 U.S.C. 355(a) makes it unlawful to introduce a "new drug" into interstate commerce until certain conditions have been met; this statute, however, is not aimed primarily at the distribution of illicit, addictive drugs patterned after schedule I or schedule II compounds, and therefore carries penalties much lighter than those imposed by the Controlled Substances Act. Concerned more with proper testing and labeling of drugs having arguably beneficial effects than with drugs sold solely for illicit purposes, the Food, Drug, and Cosmetic Act is also inapplicable to the analog problem in that the Food and Drug Administration is not properly equipped to investigate or pursue analog traffickers.

Report, *supra* at 2.

To help close this loophole, Congress in 1984 authorized temporary scheduling: "If the Attorney General finds that the scheduling of a substance in schedule I on a temporary basis is necessary to avoid an imminent hazard to the public safety, he may, by order and without regard to" various procedural requirements, "schedule such substance in schedule I if the substance is not listed in any other schedule." 2l USC § 811(h)(1). This legislation did not provide a complete solution because

[t]he emergency scheduling procedure, however, is entirely reactive and can only operate after a controlled substance analog has already been shown to pose a severe risk to the public health. The legal and scientific analysis required to pinpoint first the existence, composition, and circulation of a substance, and then to document its devastating effect, takes time (and, indeed, the emergency sched-

uling procedures themselves contain an automatic 30–day lag period). Until that usually lengthy process has been completed and the substance is formally proscribed, traffickers in the drug are immune to the penalties of the Controlled Substances Act. Even after the substance has finally been scheduled, of course, another minor alteration in its structure begins the entire process afresh.

Report, *supra* at 2. Another defect is that the temporary scheduling expired after one year. *See* 21 USC § 811(h)(2).

■ As an additional remedy, Congress amended the Controlled Substances Act in 1986 to encompass "controlled substance analogue[s]." According to the definition added as subsection (32) to 21 USC § 802, such an analogue is a substance [5]

(i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II;

(ii) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or

(iii) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system

---

and had placed at least 400 persons at serious risk of Parkinsonism. *Id.* at 4.

5. It has been contended that the definition of "controlled substance analogue" in 21 USC § 802 is vague and that a conviction based on this definition *cannot* properly be sustained. In our view, however, the definition is specific enough to give constitutionally adequate notice

of the misconduct prohibited. *United States v. Desurra,* 865 F.2d 651 (5th Cir.1989); *see Boos v. Barry,* 108 S.Ct. 1157, 1169 (1988). In the definition, the spelling "analogue" is used, while on other occasions—such as in the title of the Act—the spelling is "analog." Either spelling is permissible, although "analogue" is probably preferred.

of a controlled substance in schedule I or II.

(B) Such term does not include—

(i) a controlled substance;

(ii) any substance for which there is an approved new drug application;

(iii) with respect to a particular person any substance, if an exemption is in effect for investigational use, for that person, under section 505 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355) [21 U.S.C.A. § 355] to the extent conduct with respect to such substance is pursuant to such exemption; or

(iv) any substance to the extent not intended for human consumption before such an exemption takes effect with respect to that substance.

The Controlled Substance Analogs Enforcement Act of 1986 also provided: "A controlled substance analogue shall, to the extent intended for human consumption, be treated, for the purposes of this title and title III as a controlled substance in schedule I." Pub.L. No. 99–570, Title I, § 1202, 100 Stat. 3207–13 (1986), codified as 21 USC § 813. In 1988, this language was modified so that § 813 now reads, after the word "treated,"—"*for the purposes of any Federal law* as a controlled substance in schedule I." Pub.L. No. 100–690, Title VI, § 6470(c), 102 Stat. 4378, *reprinted in* 1988 U.S. CODE CONG. & ADMIN. NEWS 4378 (emphasis added).

### B

In the summer of 1984, the Administrator of the Drug Enforcement Administration (DEA), acting under authority delegated by the Attorney General, issued a notice of proposed scheduling of MDMA—popularly known as ECSTASY—pursuant to 21 USC § 811(a). *See* Note, *The Emergence and Emergency of Designer Drugs: Subdelegation of the Power Temporarily to Schedule in Light of United States v. Spain*, 14 Am.J.Crim.Law 257, 264 (1988). "Sixteen interested parties responded to the proposed notice of rule making; seven of those requested a hearing." *Id.* at 265

(footnote omitted). After a subsequent hearing, an administrative law judge ruled in May 1986 that MDMA should be placed in schedule III. Meanwhile, the Administrator of DEA temporarily placed MDMA on schedule I pursuant to 21 USC § 811(d). *Id.*

Thereafter, the Administrator rejected the administrative law judge's findings, made his own findings, and permanently placed MDMA on schedule I. *See* 51 Fed. Reg. 36,552 (1986); 14 Am.J.Crim.Law at 267. The legal situation that resulted has been summarized in this manner:

[P]ersons committing offenses involving MDMA occurring between July 1, 1985, and November 13, 1986, were subject to prosecution based upon MDMA's *temporary* placement in Schedule I pursuant to 21 U.S.C. 811(h). Persons committing such offenses after November 13, 1986, were subject to prosecution based upon MDMA's *permanent* placement in Schedule I pursuant to 21 U.S.C. 811 and 812. Finally, but for the fact that MDMA had already been made a controlled substance, persons committing MDMA offenses on or after October 27, 1986, would have been subject to prosecution under the Controlled Substances Analogue Enforcement Act.

*See* Harbin, *MDMA*, 2 Narcotics, Forfeiture, and Money Laundering Update (No. 1), Dept. of Justice, Criminal Division at 14 and 16 (Winter 1988).

The situation was further complicated by legal rulings which invalidated the scheduling by the Administrator. First, in *United States v. Spain*, 825 F.2d 1426 (10th Cir. 1987), the Court of Appeals ruled that the Attorney General had improperly subdelegated his temporary scheduling authority to the Administrator of DEA and had failed to give the required statutory notice of the scheduling order. Therefore, the temporary scheduling of MDMA on July 1, 1985, had been invalid; and prosecutions and convictions could not be based thereon. *Accord United States v. Caudle*, 828 F.2d 1111 (5th Cir.1987). *See also* 14 Am.J. Crim.Law at 268; Harbin, *supra* at 16–18.

The permanent placement of MDMA on schedule I, which took effect on November 13, 1986, was also challenged successfully in *Grinspoon, M.D. v. Drug Enforcement Administration*, 828 F.2d 881 (1st Cir. 1987). In this instance, the Court of Appeals held that the Administrator had erred in his application of two of the statutory standards for placing a drug in schedule I. Therefore, his scheduling order was vacated, and the case was remanded to the Administrator for further proceedings.

On remand, the Administrator again concluded that MDMA should be permanently placed in schedule I effective March 23, 1988. Accordingly, since that date, prosecutions for offenses involving MDMA may be maintained on the basis of the listing in schedule I. With respect to the situation prior to that time, a Department of Justice attorney has expressed this view:

> The effect of the *Spain, Caudle*, and *Grinspoon* decisions is to invalidate both the temporary and permanent placement of MDMA in Schedule I with the result that convictions for offenses involving MDMA based upon its temporary placement in Schedule I are subject to reversal in the Fifth and Tenth Circuits and convictions based on its permanent placement in Schedule I are subject to reversal in the First Circuit. As a practical matter, however, it appears that all federal prosecutions based upon MDMA's previous status as a Schedule I controlled substance will be subject to challenge and that such challenges are likely to be sustained.

> Unfortunately, there appears to be no alternative legal basis under federal law for reindicting MDMA offenders, except perhaps MDMA manufacturers, for offenses completed prior to *October 27, 1986*. MDMA manufacturers may be subject to reindictment under the misdemeanor "misbranding" provisions of the Food, Drug and Cosmetic Act, 21 U.S.C. 331(k) and 333(a). Prosecutors should be alert, however, to the possibility that manufacturers and other MDMA offenders whose offenses predate October 27, 1986, may

be subject to felony or misdemeanor prosecution under applicable state law.

> Persons trafficking in or possessing MDMA *on or after October 27, 1986*, through March 22, 1988, may be prosecuted under the Controlled Substances Analogue Enforcement Act (codified at 21 U.S.C. 802(32) and 813). MDMA is a well-known analogue of the Schedule I controlled substance MDA. Although the Analogue Act expressly exempts controlled substances from its coverage, prosecutors proceeding to prosecute MDMA offenses under the Analogue Act should argue that the effect of the *Spain, Caudle*, and *Grinspoon* decisions was to completely invalidate MDMA's status as a controlled substance, thereby rendering MDMA offenses suitable for prosecution under the Act.

Harbin, *supra* at 18–19.

## C

Reichenbach had used and distributed MDMA—ECSTASY—in 1987 when it was not properly listed, either temporarily or permanently, on any schedule under the Controlled Substances Act. *See* Art. 112a(b)(3). Moreover, the drug had not been listed on any schedule prescribed by the President for the purposes of Article 112a(b)(2). In order to prosecute appellant, the Government sought to invoke the Controlled Substance Analogs Enforcement Act and to claim that, by operation of 21 USC § 813, ECSTASY became "a controlled substance on schedule I" within the meaning of Article 112a(b)(3).

▉ One difficulty with this argument is that it does not conform to the statutory language. Article 112a(b)(3) encompasses any substance "that is *listed* in schedules I through V of section 202 of the Controlled Substances Act." (Emphasis added.) Although 21 USC § 813 states that a controlled substance analogue shall "be treated" as a controlled substance in schedule I, this does not constitute a "listing" of the analogue. In fact, according to the defini-

tion contained in 21 USC § 802(32)(B), the term "controlled substance analogue" "does *not* include—a controlled substance." (Emphasis added.) Thus, by the very language of the statute, because MDMA is a "controlled substance analogue," it is *not* one of the substances encompassed by Article 112a(b)(3).

A further difficulty with the Government's argument is that the definition of "controlled substance analogue" in 21 USC § 802(32)(A) originally was enacted for use in connection with the Controlled Substances Act and the Controlled Substances Export and Import Act, rather than with the Uniform Code of Military Justice. According to the language of 21 USC § 813—as it existed in 1987, when appellant's alleged offenses were committed—a "controlled substance analogue" was to be treated "as a controlled substance in schedule I" for purposes of Title 21; and no reference was made to any other part of the United States Code. Not until 1988 was section 813 amended to provide that an analogue would be treated as a schedule I controlled substance "for the purposes of *any* Federal law." (Emphasis added.)

The Government contends that the 1988 amendment to 21 USC § 813 simply clarified the original legislative intent. However, it appears to be more in the nature of remedial legislation to correct earlier omissions—such as the failure of Congress to amend Article 112a of the Uniform Code to deal with "controlled substance analogues." In this connection, these observations by Senior Judge Kastl in *United States v. Tyhurst,* 28 MJ 671, 674–75 (AFCMR), *certified,* 28 MJ 268 (1989), *cross-pet. denied,* 29 MJ 295 (1989), are persuasive:

> We find nothing in legislative history or intent to support the Government's proposition that analog drugs are covered by Article 112a. The Controlled Substance Analogs Enforcement Act, 21 U.S.C. § 813 was enacted in 1986, two years after the 1984 Manual for Courts–Martial. No subsequent action incorporated Section 813 within Article 112a. More-

over, the language of 21 U.S.C. 813 appears self-limiting: it requires the analog to be treated as a Schedule I controlled substance for purposes of "this title and Title III." "This title" and "Title III" refer to overall Federal drug supervision within 21 U.S.C. There appears to be no other specific legislative history to reveal how 21 U.S.C. § 813 was to interact with other sections of 21 U.S.C. or the UCMJ. We believe it strains logic to impute such a legislative intention when nothing suggests that 21 U.S.C. 813 was to be assimilated by the armed forces. Without some evidence, we refuse to read Article 112a as some type of military law PAC-MAN, designed to absorb every new drug law passed by Congress or ban every new drug mischief.

Although in November 1988 Congress amended 21 USC § 813 to treat analogues like controlled substances "for the purposes of any Federal law," this amendment still does not constitute a "listing" in schedule I, and it does not change the definition in 21 USC § 802(32), whereunder the terms "controlled substance" and "controlled substance analogue" are mutually exclusive. However, we need not dwell on this point, because effective March 23, 1988, MDMA has been listed in schedule I as a "controlled substance," rather than a "controlled substance analogue"; and so offenses involving the drug can be prosecuted under Article 112a(b)(3) of the Uniform Code.

### D

The Government now contends that distribution and use of ECSTASY can be prosecuted under Art. 112a(b)(1) because this substance is a "derivative" of "methamphetamine"—a substance specifically listed in (b)(1). In this connection, we note that at trial the Government never purported to proceed on this theory; and the evidence was not directed thereto.

In *Tyhurst,* Senior Judge Kastl had this comment on a government contention that a designer drug closely related to ECSTA-

SY was a "derivative" or "compound" of a substance listed in Article 112a(b)(1):

> Less obvious, perhaps is the fact that the Government has failed to carry its burden of proof that N-hydroxy MDA is either a "derivative" or a "compound" as defined in Article 112a. We are hampered by the fact that the record of trial did not develop workable definitions of these words and by the further fact that we have little expertise in chemistry. As best we can understand it, a "derivative" traditionally is the same basic drug appearing in a different form yet having the same molecular structure as its parent drug. *See* Steadman's Medical Dictionary 336 (22d Ed.1972). A "compound" is a preparation containing several ingredients. *Id.* at 276. Even the broadest definition of "derivative" drug—in a civil rather than a criminal case—requires that the copycat *be prepared from that parent drug. See Reckitt & Coleman, Ltd. v. Drug Enforcement Administration,* 788 F.2d 22, 24 (D.C.Cir.1986). As we understand it, N-hydroxy MDA is not prepared from its parent drug. Therefore, we cannot agree with our concurring brother that the offense might currently be punishable under Article 112a. Furthermore, if analogs are already covered as "derivatives" of outlawed drugs, there would have been no need to revisit a half century of classifying drugs by their precise molecular structure and take a new approach in the Analog Act in 1986.

28 MJ at 675.

■ Similarly, we conclude that, in appellant's trial, the evidence of record was inadequate to prove beyond a reasonable doubt that ECSTASY was a "derivative" of a drug listed in Article 112a(b)(1).

### E

Under 21 USC § 841, it is unlawful for any person knowingly or intentionally—

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance[.]

By reason of 21 USC § 813, a "controlled substance analogue"—like ECSTASY—may be treated as "a controlled substance" for purposes of 21 USC § 841.

During oral argument, we asked both counsel whether Reichenbach's distribution and use of ECSTASY could be prosecuted under the Uniform Code of Military Justice on the theory that 21 USC § 841—as modified by 21 USC § 813—proscribed "crimes and offenses not capital" within the meaning of the third clause of Article 134. Both appellate government counsel and appellate defense counsel seemed concerned that incorporating § 841 in this way might violate the doctrine of preemption.

This Court first recognized that doctrine in *United States v. Norris,* 2 USCMA 236, 8 CMR 36 (1953), which held that Article 121, prohibiting larceny and wrongful appropriation, preempted any prosecution under Article 134 for wrongful taking. Since *Norris,* we have applied the preemption doctrine on various occasions. For example, in *United States v. Irvin,* 21 MJ 184, 187–89 (CMA), *on remand,* 22 MJ 559 (AFCMR), *aff'd in part, dismissed in part,* 22 MJ 342 (CMA), *cert. denied,* 479 U.S. 852, 107 S.Ct. 183, 93 L.Ed.2d 117 (1986), we held that the doctrine of preemption precluded use of the Assimilative Crimes Act—as incorporated by Article 134—to punish an accused servicemember for misconduct which was the subject of a specific punitive article in the Uniform Code.

On the other hand, in *United States v. Wright,* 5 MJ 106 (CMA 1978), the Court ruled that the Uniform Code did not entirely preempt the Assimilative Crimes Act. Moreover, *United States v. Kick,* 7 MJ 82 (CMA 1979), held that, even though the Code contains punitive articles proscribing murder and manslaughter, the crime of negligent homicide could nonetheless be prosecuted under Article 134.

■ As we understand these decisions, the rationale of preemption is that, if Congress has covered a particular kind of misconduct in specific punitive articles of the

Uniform Code, it does not intend for such misconduct to be prosecuted under the general provisions of Article 133 or 134. In light of the legislative history of Article 112a—to which we have already adverted—enactment of that Article precludes prosecution under the first two clauses of Article 134, which concern service-discrediting conduct and conduct prejudicial to good order.[6]

We come to a different conclusion with respect to prosecutions based on the third clause of Article 134. As we construe the legislative intent manifested in Article 112a, Congress was well aware of the threat that drug use poses to the military mission;[7] and it wished to facilitate and simplify drug prosecutions. That goal is quite consistent with the purpose of the third clause of Article 134—namely, to allow military authorities to prosecute misconduct that could be the basis for criminal prosecution in a federal district court. We conclude, therefore, that enactment of Article 112a did not preempt prosecutions under Article 134 for drug-related misconduct which violated Title 21 of the United States Code.[8]

■ In such prosecutions, the criminal liability of the servicemember is the same as if he were being prosecuted in a federal district court. However, with respect to distribution of MDMA after the drug was properly placed on schedule I in March 1988, a prosecution under Article 134 could not be maintained. According to the statutory definition, a "controlled substance" is not a "controlled substance analogue." 21 USC § 802(32)(B). Therefore, 21 USC § 813 would no longer apply to MDMA after it had been properly scheduled; instead offenses involving ECSTASY would then be prosecuted under Article 112a.

■ When construed with 21 USC § 813, section 841 provides that it shall be unlawful "for any person knowingly or intentionally ... to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense," a controlled substance analogue. Accordingly, a servicemember could be prosecuted under 21 USC § 841, as incorporated in Article 134 of the Uniform Code, for knowing or intentional distribution of ECSTASY prior to March 1988, when MDMA was properly placed on schedule I by the Administrator of DEA.

Under 21 USC § 841, the Government was required to establish that Reichenbach's distribution of ECSTASY was "knowing" or "intentional." The second specification in the Additional Charge alleges "wrongful" distribution; and, for some purposes, this Court has construed wrongfulness to include a requirement of "knowledge." Cf. United States v. Mance, 26 MJ 244 (CMA), cert. denied, — U.S. —,109 S.Ct. 367, 102 L.Ed.2d 356 (1988). Moreover, when guilty pleas are involved, we have generally upheld the sufficiency of a specification, if the essential averments were reasonably included within the language of the specification. See, e.g., United States v. Brecheen, 27 MJ 67 (CMA 1988); United States v. Watkins, 21 MJ 208 (CMA 1986).

In the present case, appellant was not claiming that his distribution of ECSTASY was without his knowledge of the nature of the drug involved. Instead, he was contending that this particular drug was not subject to prosecution in a court-martial. Furthermore, the providence inquiry made it clear that the distribution was "knowing and intentional."[9] Under these circum-

---

**6.** Prosecution in this manner was common prior to the enactment of Article 112a (see United States v. Ettleson, 13 MJ 348, 358 (CMA 1982)); and Article 112a was intended to eliminate the occasion for such prosecutions.

**7.** See n. 2, supra; cf. Murray v. Haldeman, 16 MJ 74 (CMA 1983); United States v. Trottier, 9 MJ 337 (1980).

**8.** According to the Senate Report on Article 112a, "This amendment [adding Art. 112a] is intended to apply solely to offenses within its express terms. It does not preempt prosecution of drug paraphernalia offenses or other drug-related offenses under Article 92, 133, or 134 of the UCMJ." S.Rep. No. 53, supra (n. 2) at 29.

**9.** If the plea of guilty had been unconditional, the findings of guilty of wrongful distribution, in violation of Article 112a, might be sustained

stances, we consider that the findings of guilty as to the specification of wrongful distribution of ECSTASY should be treated as a conviction under Article 134—rather than under Article 112a—and that the maximum confinement imposable is dictated by 21 USC § 841.

■ The "use" of controlled substances is not prohibited by 21 USC § 841; but possession of a controlled substance is punishable under 21 USC § 844. In light of 21 USC § 813, we conclude that, until MDMA was permanently scheduled effective March 1988, possession of this drug was punishable because it was a controlled substance analogue.

■ In interpreting the Uniform Code, we sometimes have treated "possession" of a drug as included within its "use." Thus, it could be argued that the specification alleging Reichenbach's "use" of ECSTASY should be construed to allege "possession." However, in civilian jurisprudence, "use" has generally been considered separable from possession; and there is precedent that proof of "use" (e.g., presence of the drug in the bloodstream) does not establish "possession." [10] Under these circumstances, we are reluctant to construe the allegation in the same way that we would treat an allegation of "wrongful use" under Article 112a. Accordingly, we conclude that

on the rationale of *United States v. Felty,* 12 MJ 438 (CMA 1982).

**10.** *See, e.g., Minnesota v. Lewis,* 394 N.W.2d 212 (Minn.1986); *Kansas v. Flinchpaugh,* 232 Kan. 831, 659 P.2d 208 (1983); *Oregon v. Downes,* 31 Or.App. 1183, 572 P.2d 1328 (1977); *Washington v. Reid,* 66 Wash.2d 243, 401 P.2d 988 (1965). A typical rationale for this conclusion was stated by the Kansas Supreme Court:

Once a controlled substance is within a person's system, the power of the person to control, possess, use, dispose of, or cause harm is at an end. The drug is assimilated by the body. The ability to control the drug is beyond human capabilities. The essential element of control is absent. Evidence of a controlled substance after it is assimilated in a person's blood does not establish possession or control of that substance. The Court of Special Appeals of Maryland has agreed:

"Once a narcotic drug is injected into the vein, or swallowed orally, we think it appar-

specification 1 of the Additional Charge, alleging wrongful use, should be dismissed. We are, however, convinced that this error did not increase the sentence.

## II

The decision of the United States Air Force Court of Military Review is reversed as to specification 1 of the Additional Charge. The finding of guilty thereon is set aside and that specification is dismissed. The Additional Charge is modified by substituting Article 134 for Article 112a as the Article violated. In all other respects, the decision below is affirmed.

Judge SULLIVAN concurs.

COX, Judge (concurring in the result):

Although I recognize that one unfortunate consequence of our interpretation of Article 112a, Uniform Code of Military Justice, 10 USC § 912a, is that simple use of a controlled substance analogue is apparently not prosecutable in the military, I nevertheless am unable to find any authority which contradicts the analysis and conclusions of the majority opinion. To close this loophole, it would appear that a legislative modification of Article 112a is necessary to change this result, if desired.

ent that it is no longer within 'one's control' or held at 'one's disposal.' And it would likewise be beyond the taker's ability to exercise any restraining or directing influence over it. Consequently, once the drug is ingested and assimilated into the taker's bodily system, it is no longer within his control and/or possession in the sense contemplated by Section 277." *Franklin v. State,* 8 Md.App. 134, 138, 258 A.2d 767 (1969), cert. denied 257 Md. 733 (1970).

\* \* \* \* \* \*

Discovery of a drug in a person's blood is circumstantial evidence tending to prove prior possession of the drug, but it is not sufficient evidence to establish guilt beyond a reasonable doubt. The absence of proof to evince knowledgeable possession is the key. 659 P.2d at 211, 212. We are unaware of any Federal prosecution in which "use" has been equated with "possession."

However, simple logic would lead one to the following analysis:

1. Congress says "controlled substance analogue[s] shall ... be treated ... as a controlled substance in Schedule I." 21 USC § 813.

2. Congress says it is illegal for a military member to wrongfully *use*, possess, manufacture, or distribute a controlled substance which "is listed in schedules I through V of section 202 of the Controlled Substances Act (21 U.S.C. 812)." Art. 112a.

3. To "treat" in this context means "to regard and deal with in a specified manner—usually used with *as.*" *Webster's New Collegiate Dictionary* 1235 (1979).

Therefore, I conclude that when Congress said to treat an analogue as if it were a controlled substance, it meant to consider the analogue as included on the list for purposes of making the analogue an illegal substance. Thus, I would have no problem *at all* in holding that the wrongful use, possession, or distribution of controlled substance analogues can be "treated" as a Schedule I drug under Article 112a.