# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
HAIGHT, PENLAND, and WOLFE
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Specialist RONNIE M. ROGERS**
**United States Army, Appellant**

ARMY 20131074

Headquarters, Fort Campbell
Tyesha L. Smith, Military Judge
Lieutenant Colonel Sebastian A. Edwards, Staff Judge Advocate

For Appellant: Lieutenant Colonel Charles D. Lozano, JA; Major M. Patrick Gordon, JA; Captain Ryan T. Yoder, JA (on brief).

For Appellee:  Major A.G. Courie, III, JA; Major Daniel D. Derner, JA; Captain Timothy C. Donahue, JA (on brief).

18 December 2015

----------------------------------
MEMORANDUM OPINION
----------------------------------

HAIGHT, Senior Judge:

A military judge sitting as a general court-martial convicted appellant, pursuant to his pleas, of two specifications of failure to obey a lawful general regulation, wrongful use of marijuana, wrongful use of methiopropamine, wrongful introduction of methiopropamine, one specification of wrongful communication of a threat, and one specification of wrongful communication of a threat to harm a person or property by means of an explosive, in violation of Articles 92, 112a, 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892, 912a, and 934 (2012) [hereinafter UCMJ].  The military judge sentenced appellant to a bad-conduct discharge, confinement for 35 months, forfeiture of all pay and allowances, and reduction to the grade of E-1.  The convening authority, consistent with a pretrial agreement, approved only 18 months of confinement but otherwise approved the adjudged sentence.

This case is before us for review under Article 66, UCMJ.  Appellate defense counsel raises two assignments of error, both of which merit discussion and relief.

Appellant personally submitted matters pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), none of which merits discussion or relief.

## LAW AND DISCUSSION

### 1. Chemical Analogues

Appellant was charged with, pleaded guilty to, and convicted of wrongfully using methiopropamine, a Schedule II controlled substance, as well as introducing methiopropamine, "a Schedule II controlled substance onto an installation used by the armed forces, to wit:  Fort Campbell, Kentucky."  Appellant now asserts crimes involving chemical analogues, such as methiopropamine, should not be charged under Article 112a, UCMJ.  The government concedes the military judge committed "error by accepting appellant's guilty plea to a violation of Article 112a, UCMJ for use and introduction of methiopropamine onto Fort Campbell."  We agree and accept the government's concession.

Methiopropamine is not a Schedule II controlled substance; it is a methamphetamine analogue.  During the providence inquiry, its status as a controlled drug analogue was discussed and agreed upon by all parties.  We find no support that analogue drugs are covered by Article 112a.  *See United States v. Reichenbach*, 29 M.J. 128 (C.M.A. 1989).  Accordingly, we will set aside the findings of guilty to Specifications 2 and 3 of Charge II and dismiss those same specifications.  We expressly decline to follow the government's proposal to affirm a conviction of the "lesser-included offense" of wrongful possession of methiopropamine "under clause 3 of Article 134, UCMJ."  *See United States v. Jones*, 68 M.J. 465 (C.A.A.F. 2010); *United States v. Medina*, 66 M.J. 21 (C.A.A.F. 2008).

### 2. Communicating a Threat

Upon execution of a commander's search authorization, drugs and drug paraphernalia were found in appellant's barracks room.  Also discovered were boxes of 45 caliber ammunition, an ordnance explosive disposal bomb suit, a breach kit, and copies of *The Anarchist Cookbook*, *Mein Kampf*, and *The Communist Manifesto*.  Criminal Investigation Command (CID) called appellant in to discuss what was found in his room.  After a proper rights advisement and waiver, appellant made statements to CID.  It is these statements that form the basis for the two threat specifications.

Appellant was charged with, pleaded guilty to, and convicted of communicating to "Special Agent [ZPC] a threat to torture and kill Sergeant [LC] if he pushed him too far" as well as communicating "certain information to Special Agent [ZPC], to wit:  'I buried two [improvised explosive devices] in the Hohenfels

Training Area.'"  Appellant now asserts that the military judge abused her discretion in accepting his guilty pleas to these threat offenses.

*a. Threat to Kill Sergeant LC*

First, appellant claims he never stated the alleged words, "I will kill Sergeant [LC] if he pushes me too far," or words to that effect, during his CID interview. During the providence inquiry, appellant explained he had harbored thoughts of violence in the past, prior to his CID interview, stating:

> I fell out of the [formation] run . . . . [Sergeant LC] proceeded to initiate a smoke fest on me.  A smoke fest is non-stop [physical training] for as long as he wanted.  I am used to smoke fests, unfortunately with him, it was to the point, even when other [noncommissioned officers] were there laughing, they started walking away because they knew it was wrong.  It continued on until he finally got in my face and told me if I wanted to quit, just quit.  I stopped what I was doing after an initial period and I told him "I quit."  He asked me what I was talking about.  "You told me if I wanted to quit, tell you I quit."  So, I stood there, and he had me face around and face the wall for long enough.  The day after, they had a meeting with me and a bunch of the other NCOs.  After more or less he got done smoking me, *at the time*, I wanted to kill [Sergeant LC], Your Honor.

The above statement made by appellant during the providence inquiry clearly indicates that he, at one point *in the past*, may have wanted to kill Sergeant (SGT) LC.  However, this explanation does not support the notions that appellant either voiced his homicidal desire to anybody when he harbored it or that any plan to carry out that intent persisted up until the time of his CID interview.  Notwithstanding, during the providence inquiry, appellant agreed that he told Agent ZPC that SGT LC "pissed me off and I wanted to kill him."  Appellant further agreed that the agent could have "surmised" from that statement during the interview that appellant "still planned on killing" SGT LC.

In direct contrast to the providence inquiry, the video recording of the CID interview, admitted into evidence and attached to the stipulation of fact, reveals that appellant never said he was going to kill or torture SGT LC.  Nor did appellant, at the time of his statement to Agent ZPC, express a present or future intent to kill SGT LC.  This plain inconsistency between the providence inquiry and the video recording, admitted as part of the stipulation of fact, was never addressed or resolved.  The government now concedes that appellant did not make the alleged

threat against SGT LC during his interview with CID and agrees that Specification 1 of Charge III should be dismissed. We agree, accept the government's concession, and will set aside the finding of guilty to this threat offense.

### b. Bomb Threat

Second, appellant claims there is a substantial basis in law and fact to question his guilty plea to the bomb threat as he never expressed during his CID interview a present determination or intent to kill, injure, or intimidate anybody or damage or destroy any property, presently or in the future.

During the providence inquiry, appellant explained his alleged bomb threat, as communicated to CID, in the following manner:

> ACC: Myself and two friends experimented with making different pyro elements, mainly incendiary, like [napalm] and so on, and making bombs, blowing stuff up on our free time, while being Soldiers in Hohenfels. We actually made up to a number of different explosives and we detonated a few of them. These two, we did not. When we more or less figured, we were not going to detonate them, we dismantled them as best as we could then buried them in the Hohenfels Training Area, Your Honor.
>
> MJ: So what exactly did you state to Special Agent [ZPC]?
>
> . . . .
>
> ACC: "I buried two IEDs in the Hohenfels Training Area," Your Honor. To me though, at the time, whenever I said that, the explosives were -- aside from being dismantled, they were inactive, Your Honor, is how I was taking it to him.
>
> . . . .
>
> MJ: Did you believe that the language that you used or communicated amounted to a threat?
>
> ACC: At the time, I didn't believe it would amount to a threat. He was asking me questions; I was answering as truthfully as I could, Your Honor. But now, seeing it, it would be a threat, Your Honor.

. . . .

> MJ:  It is reasonable for him to conclude that those IEDs presented a continuing threat; would you agree with that?
>
> ACC:  I would agree with that, Your Honor.  Except with, if there's no primer on them, they cannot go off, Your Honor, and being that it's been 8 months ago, they would have decayed to the point beyond anything, Your Honor.

Throughout appellant's interview with CID, he makes it abundantly clear that he "does not care if innocent people are hurt or die."  In response to appellant's assignment of error, the government contends that we should equate appellant's reprehensible apathy for the potentially tragic results if the abandoned and buried IEDs accidentally went off some time in the future with an expressed intent to do harm.  Although we find appellant's voiced sentiments to be spectacularly craven, we cannot legally equate his lack of concern with the requisite intent.

Our legal analysis of a threat takes into account "both the words used and the surrounding circumstances."  *United States v. Brown*, 65 M.J. 227, 232 (C.A.A.F. 2007).  After viewing the video recording of the CID interview, it is clear that appellant, as he himself admitted, possesses deeply troubling, demented, and dark aspects to his personality.  However, it is equally clear that during his interview with CID, appellant was admitting those aspects and confessing to past misconduct – he was not communicating a threat to do harm in the future.  Although admitting to profound behavioral instability and a disconcerting lack of empathy, he never expressed a present intent to do harm by means of the buried explosives, presently or in the future.  Accordingly, we will set aside the finding of guilty to the bomb threat offense.

## CONCLUSION

The findings of guilty to Specifications 2 and 3 of Charge II are set aside and those specifications are DISMISSED.  The findings of guilty to Specifications 1 and 3 of Charge III are set aside and those specifications and that charge are DISMISSED.  The remaining findings of guilty are AFFIRMED.

The sentence is set aside.  In accordance with Rule for Courts-Martial 810, a rehearing is authorized.  All rights, privileges, and property, of which appellant has been deprived by virtue of that portion of the findings and sentence set aside by our decision, are ordered restored.  *See* UCMJ arts. 58b(c) and 75(a).

Judge PENLAND and Judge WOLFE concur.

5



FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court